UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

HORACE ABNEY,

                                        Plaintiff,

        -against-                                01 Civ. 8444 (SAS) (FM)

JOHN MCGINNIS, MARIO MALVAROSA, PAUL
WILSON, ANN ARCKERT, MICHAEL DIPOMPO, and
JOHN and JANE DOE,

                                        Defendants.

------------------------------------------------------------------------ x


**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS
<u>FOR SUMMARY JUDGMENT</u>**


                                        Rose M. Weber
                                        Attorney for Plaintiff
                                        225 Broadway, Suite 1608
                                        New York, NY 10007
                                        (212) 748-3355

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ..................................................................... 1

STANDARD FOR SUMMARY JUDGMENT ........................................... 8

ARGUMENT

       POINT I

           THERE ARE ISSUES OF MATERIAL FACT AS
           TO WHETHER PLAINTIFF'S FOOT
           CONDITION WAS SUFFICIENTLY SERIOUS. ..................................... 9

       POINT II

           THERE ARE ISSUES OF MATERIAL FACT AS
           TO WHETHER DEFENDANTS WERE
           DELIBERATELY INDIFFERENT TO
           PLAINTIFF'S FOOT CONDITION. ...................................................... 11

       POINT III

           SUPERINTENDENT MCGINNIS WAS
           PERSONALLY INVOLVED. .............................................................. 14

       POINT IV

           DEFENDANTS ARE NOT ENTITLED TO
           QUALIFIED IMMUNITY.. ............................................................... 16

CONCLUSION .................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Atkinson v. Selsky*,
    2004 WL 2319186 (S.D.N.Y. Oct. 15, 2004) ........................................................ 14

*Brady v. Town of Colchester*,
    363 F.2d 205 (2d Cir. 1988)........................................................................... 8

*Brock v. Wright*,
    315 F.3d 158 (2d Cir. 2003)........................................................................... 9

*Chambers v. TRM Copy Centers Corp.*,
    43 F.3d 29 (2d Cir. 1994) ............................................................................. 8

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998)........................................................................... 13

*Denis v. N.Y.S. Dep't of Corr. Svces.*,
    2006 WL 217926 (S.D.N.Y. Jan. 30, 2006) ........................................................ 13

*Dipace v. Goord*,
    308 F. Supp. 274 (S.D.N.Y. 2004)................................................................... 16-17

*Estelle v. Gamble*,
    429 U.S. 97 (1976)...................................................................................... 12

*Hathaway v. Coughlin*,
    37 F.3d 63 (2d Cir. 1994) ............................................................................. 12

*Hope v. Pelzer*,
    122 S. Ct. 2508 (2002).................................................................................. 16

*Howard v. Schoberle*,
    907 F. Supp. 671  (S.D.N.Y. 1995).................................................................. 8

*International Union v. United States Marshal's Svce.*,
    350 F. Supp. 2d 522 (S.D.N.Y. 2004).............................................................. 8

*Johnson v. Wright*,
    234 F. Supp. 2d 352 (S.D.N.Y. 2002)......................................................... 12, 14, 16

*Kemp v. Wright*,
    2005 WL 893571 (E.D.N.Y. Apr. 19, 2005) ....................................................... 13

*Nunez v. Hasty*,
   2006 WL 2589254 (E.D.N.Y. Sept. 8, 2006) ........................................................ 14

*Papineau v. Parmley*,
   465 F.3d 46, 55 (2d Cir. 2006) ........................................................................... 16

*Saucier v. Katz*,
533 U.S. 194, 201 (2001) ...................................................................................... 16

*Thomas v. Arevalo*,
   1998 WL 427623 (S.D.N.Y. July 28, 1998) ....................................................... 11

*Weyant v. Okst*,
   101 F.3d 845 (2d. Cir. 1996) ................................................................................. 8

*Williams v. Director of Health Svces.*,
   542 F. Supp. 883 (S.D.N.Y. 1982) ..................................................................... 12

*Williams v. Koenigsmann*,
   2005 WL 1115426 (S.D.N.Y. May 10, 2005) ..................................................... 15

*Williams v. Vincent*,
   508 F.2d 541 (2d Cir. 1974) ............................................................................... 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x

HORACE ABNEY,

                              Plaintiff,        **MEMORANDUM OF LAW**

              -against-               01 Civ. 8444 (SAS) (FM)

JOHN MCGINNIS, MARIO MALVAROSA, PAUL
WILSON, ANN ARCKERT, MICHAEL DIPOMPO, and
JOHN and JANE DOE,

                              Defendants.

------------------------------------------------------------------------- x

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

      Defendants former Superintendent John McGinnis, Dr. Mario Malvarosa, Physician's Assistant Paul Wilson, former Nurse Administrator Ann Eckert (named erroneously as "Arckert") ("DOCS Defendants"), and Michael DiPompo have moved for summary judgment. Plaintiff Horace Abney respectfully submits this Memorandum of Law in opposition to defendants' motions on the grounds that material issues of fact exist and that defendants are not entitled to summary judgment as a matter of law.

### STATEMENT OF FACTS

      During the two-and-one-half years that plaintiff was incarcerated at Downstate Correctional Facility, he made almost thirty visits to sick call because of his foot condition, made countless additional complaints to defendants Malvarosa and Wilson, and was seen by defendant

DiPompo an additional thirteen times.  Nonetheless, plaintiff spent virtually his entire jail sentence in terrible pain, becoming more and more disabled, because he was never given the proper medical equipment.

Plaintiff suffers from congenital flat feet, hallux valgus, and hammer toes. (DOCS 56.1 Statement ¶ 9)  Plaintiff arrived at Downstate on May 26, 1999, (*id.* at ¶ 12), wearing worn out orthopedic shoes and temporary arches, (Pl. Tr.[1] at 25-27).  The next day, plaintiff spoke with Nurse Administrator Eckert about his foot condition (about which she was aware from plaintiff's previous incarceration) and was advised that until his medical records could be obtained, he would not be issued new footwear.  (*Id.* at 24-25.)

Plaintiff's feet and knees began hurting almost immediately, and he so advised Dr. Malvarosa on June 14, 1999.  (*Id.* at 28; DOCS 56.1 Statement ¶ 14.)  Plaintiff saw Dr. Malvarosa again on June 29, 1999 and July 10, 1999,[2] (DOCS 56.1 Statement ¶¶ 17 and 18), but still was not provided with the proper footwear.  Accordingly, plaintiff filed his first grievance on July 12, 1999.  (DOCS Ex. B.)

Finally, on July 26, 1999, plaintiff saw Mr. DiPompo, who recommended diagnostic casting of plaintiff's feet.  (DOCS 56.1 Statement ¶ 23.)  On August 6, 1999, plaintiff complained to Dr. Malvarosa that his knees and back were hurting because of his foot condition.

---

[1] "Pl. Tr." refers to the transcript of plaintiff's deposition attached to the Declaration of Rose M. Weber ("Weber Decl.") as Exhibit A.

[2] At his deposition, Dr. Malvarosa testified that, in addition to official sick call visits, plaintiff grabbed him in the hallway every chance he got to complain about his lack of proper footwear. (Deposition of Mario Malvarosa ("Malvarosa Dep.") (attached to Weber Decl. as Exhibit B) at 29-30.)  Plaintiff also spoke informally numerous times with P.A. Wilson.  (Declaration of Horace Abney ("Abney Decl.") ¶ 9.)  Accordingly, the official visits listed herein represent only a small portion of the complaints made by plaintiff.

(Bates[3] 250.)  On August 9, 1999, Mr. DiPompo made the cast of plaintiff's feet.  (DOCS 56.1

Statement ¶ 25.)  Between then and August 30, 1999, plaintiff "persistently questioned" Dr.

Malvarosa as to when new footwear would be supplied.  (Bates 250.)  At that point, plaintiff had

been wearing his original shoes, which were already worn out when he arrived at Downstate, for

an additional three months.

On August 30, 1999, Mr. DiPompo gave plaintiff sneakers and orthoses.

(DOCS 56.1 Statement ¶ 27.)  One week later (on September 7, 1999), plaintiff requested

orthopedic boots.  (*Id.* ¶ 28.)  The boots were not ordered for another two weeks and did not

arrive until October 22, 1999.  (*Id.* ¶ 32.)  By then, plaintiff had been without proper prison

footwear for five months.[4]  Unfortunately, by the time the boots arrived, the orthoses had already

broken, after less than two months of use.  (*Id.* ¶ 31.)

Mr. DiPompo provided new orthoses on November 2, 1999.  (*Id.* ¶ 34.)  Right

from the beginning, the orthoses and boots caused problems for plaintiff, digging into his skin,

cutting his ankles, and causing his feet to swell up.  (Pl. Tr. at 55-57.)  Plaintiff's sore feet also

caused his knees and back to hurt.  (*Id.*)  Plaintiff complained repeatedly over the ensuing

months to Dr. Malvarosa and to P.A. Wilson, but was told that all that they could do for him was

to give him painkillers.  (*Id.*)

On March 29, 2000, Mr. DiPompo determined that plaintiff needed new boots.

(DOCS 56.1 Statement ¶ 38.)  Plaintiff was given the boots on April 25, 2000, and on May 11,

2000 advised Dr. Malvarosa that the boots were too tight and that the orthoses were cutting into

---

[3] "Bates" refers to pages from plaintiff's medical records contained in DOCS Exhibit D.

[4] As in noted under Point II, *infra*, DOCS regulations require that prisoners wear boots, not
sneakers, presumably for their own safety.

his skin. (*Id.* ¶¶ 40-41.) Although that same day Dr. Malvarosa put in a request that Mr. DiPompo deal with the situation, Mr. DiPompo did not come to the prison until June 12, 2000 (a full month later), and there is no indication that Dr. Malvarosa or anyone else followed up in regard to the delay. (Bates 157.) In the meantime, plaintiff had returned to sick call on May 25, 2000, complaining to P.A. Wilson about the tightness of the boots. (DOCS 56.1 Statement ¶ 42.)

When Mr. DiPompo finally saw plaintiff on June 12, 2000, he noted that the boots and orthoses needed to be modified, and he took those items with him. (Bates 157; Pl. Tr. at 57.) When Mr. DiPompo had not returned with those essential items a full month later (i.e., by July 10, 2000), plaintiff complained to P.A. Wilson. (Bates 242.) It appears that plaintiff finally got the boots and orthoses back on or about July 17, 2000. The boots and orthoses, however, hurt plaintiff as much as they had before they were taken from him. (Pl. Tr. at 64-65.) Over the next several months, plaintiff spoke with defendants Malvarosa and Wilson repeatedly about the chronic pain in his feet, ankles, knees, hips, and back. (Abney Decl. ¶ 11.)

On July 24, 2000, plaintiff complained of a decrease in lateral movement because of the defective arch supports. (Bates 241.) A prosthetics consult was ordered, but appears to have been denied by CPS. (DOCS 56.1 Statement ¶ 47.) Although P.A. Wilson indicated on August 21, 2000 that he was going to see if a consult had been put in for Mr. DiPompo, (Bates 241), there is no indication that he ever did so.

Plaintiff filed his second grievance on August 21, 2000, complaining that the orthoses were still cutting into his ankles. (DOCS Ex. B.) On September 22, 2000, the IGRC unanimously agreed that plaintiff had been waiting far too long to see Mr. DiPompo and that he should be seen "A.S.A.P." (*Id.*) On September 28, 2000, Superintendent McGinnis stated that "the consulting Orthopod has been contacted to come into the facility and address grievant's

condition/needs relative to his orthopedic footwear. (*Id.*) Defendant McGinnis made this statement even though he had no idea whether Mr. DiPompo had been contacted. (Deposition of John McGinnis ("McGinnis Dep.") (attached to Weber Decl. as Exhibit C) at 36-38.)

In fact, it wasn't until October 13, 2000, almost three months after plaintiff's most recent series of complaints, that he was seen by Mr. DiPompo. (DOCS 56.1 Statement ¶ 52.) Mr. DiPompo again took plaintiff's orthoses and boots. (*Id.*) Although plaintiff was left with sneakers and an old pair of arch supports, all of the arch supports were equally defective and plaintiff couldn't wear them at all half of the time because they were so painful. (Pl. Tr. at 76-77.)

This time, Mr. DiPompo did not return with the orthoses and boots for three full months (i.e., until January 11, 2001). (Bates 150.) Plaintiff complained about this at sick call on November 13, 2000 and November 20, 2000. (Bates 138.) Plaintiff also filed his third grievance on November 20, 2000, noting that he had effectively been without proper arch supports since July. (DOCS Ex. B.) The IGRC unanimously recommended "speedy resolution" of plaintiff's problem on December 1, 2000. (*Id.*)

On December 5, 2000, Superintendent McGinnis simply stated that "the facility is currently awaiting reception of the special footwear being prepared by the consulting orthotics specialist." (*Id.*) Defendant McGinnis admits that he made no effort to look into why the matter was taking so long or whether a firm date had been provided, that he never directed anyone to speed up the process, and that he never followed up to see whether the equipment had ever come in. (McGinnis Dep. at 41.)

Meanwhile, on December 1, 2000, plaintiff again went to sick call to request his orthoses, this time from P.A. Wilson. (Bates 238.) It appears that defendant Wilson may have

issued off-the-shelf arch supports, but there is no indication that he did anything to follow up on the status of the orthoses. (*Id.*) On January 9, 2001, plaintiff again saw P.A. Wilson, complaining of foot pain and swelling and noting that he had still not received his orthoses or boots back, even though he had seen Mr. DiPompo on October 13, 2000. (Bates 237.)

Mr. DiPompo finally reappeared on January 11, 2001 with the modified orthoses. (DOCS 56.1 Statement ¶ 60.) The arches caused plaintiff's feet to swell up and hurt so much that he had to take them out and would walk around without them, until his back and knees would begin hurting so badly that he would have to put the arches back in. (Pl. Tr. at 81.)

On February 12, 2001, plaintiff complained to P.A. Wilson that the orthoses were cramping his forefoot and needed to be cut down. (Bates 236.) Defendant Wilson indicated that he would advise "Michael" (presumably Mr. DiPompo) about the situation. (*Id.*) On March 6, 2001, plaintiff complained to Dr. Malvarosa about the same issue. (Bates 234.) Plaintiff again complained to P.A. Wilson on March 15, 2001 and March 26, 2001. (Bates 235.) There is no indication that anything was done about any of these March 2001 complaints.

Finally, on March 30, 2001, plaintiff was seen by Mr. DiPompo, who indicated that a modification of the orthoses would be done and that he would be back with them and plaintiff's boots in two weeks. (Bates 147; DOCS Ex. B.) When Mr. DiPompo had not returned by April 16, 2001, plaintiff filed his fourth grievance. (DOCS Ex. B.) On April 27, 2001, the IGRC unanimously "recognized that grievant appears to have been waiting an inordinate amount of time for his boots." (*Id.*)

Mr. DiPompo delivered the boots and orthoses on May 8, 2001. (Bates 262.) The arch supports, however, were too thick, and plaintiff could barely get his foot into the boot with the arches inserted. (Abney Decl. ¶ 12.) Upon being advised of this situation, Mr. DiPompo told

plaintiff that he would just have to get used to it.  (*Id.* ¶ 13.)  The new footwear caused plaintiff's feet to swell and he could keep the arches in for only five minutes at a time.  (*Id.* ¶ 14.)  Plaintiff complained to P.A. Wilson about this situation on May 22, 2001 and again on June 21, 2001, as well as to Dr. Malvarosa on July 9, 2001 and July 30, 2001.  (Bates 233, 234.)  Finally, on August 16, 2001 (more than three months after this round of complaints began), plaintiff was seen by a different orthotic specialist, at Green Haven Correctional Facility.  (DOCS 56.1 Statement ¶ 82.)

The orthotic specialist at Green Haven told plaintiff that his arch supports were defective and that he understood why plaintiff was experiencing so much pain.  (Abney Decl. ¶ 15.)  Although the Green Haven specialist wanted to fit plaintiff with new boots and orthoses, it appears that the proper approval was never secured.  Plaintiff saw Dr. Malvarosa for the final time on September 24, 2001, still complaining of foot pain, as he had for his entire two-and-one-half years at Downstate.  (Bates 230.)  Plaintiff was transferred to Eastern Correctional Facility on September 28, 2001.  (*Id.*)

## STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment "may not be granted unless the court determines that there is no genuine issue of material fact and that the undisputed facts warrant judgment for the moving party as a matter of law." *Howard v. Schoberle*, 907 F. Supp. 671, 676 (S.D.N.Y. 1995). In determining whether summary judgment is appropriate, "[t]he court is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *International Union v. United States Marshal's Svce.*, 350 F. Supp. 2d 522, 527 (S.D.N.Y. 2004). "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Howard*, 907 F. Supp. at 677 (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). In deciding a summary judgment motion, "the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "[A]ll doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir. 1988).

# ARGUMENT

## POINT I

### THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER PLAINTIFF'S FOOT CONDITION WAS SUFFICIENTLY SERIOUS.

In their moving papers, DOCS Defendants maintain that plaintiff's foot condition was not objectively sufficiently serious to meet the constitutional standard of *Estelle v. Gamble*, 429 U.S. 97 (1976), because plaintiff's "allegations of pain are not enough to establish the objective seriousness of his condition." (DOCS Mem. at 12.) The Second Circuit, however, has held that allegations of severe pain create an issue of fact as to whether a plaintiff suffers from a serious medical condition:

> The district court held that Brock's scar was not a serious medical condition, because the pain associated with the scar "although uncomfortable and annoying" is not "extreme" and because the scar does not present a risk of serious harm as would an infected wound. The evidence offered by Brock is more fairly characterized as proof of *chronic* pain the magnitude of which probably falls somewhere between "annoying" and "extreme." At summary judgment we must fully credit Brock's and Farooq's affidavits. It follows that the district court either erred in not treating that evidence as true or believed that only "extreme pain" or a degenerative condition would suffice to meet the legal standard. And the latter would also be wrong, for we have long held that "the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain." *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977). We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one.

*Brock v. Wright*, 315 F.3d 158, 163-64 (2d Cir. 2003).

As is evident from defendants' brief, the inquiry into the pain suffered by any given inmate is unique and fact-specific.  In each of the cases cited by defendants, the Court considered the nature of the foot ailment alleged and the degree of pain experienced.  In the instant matter, plaintiff alleges that he was in severe pain over an extended period of time, and the medical records document that plaintiff sought help for his foot condition literally dozens of times over a two-year period.  At the very least, there exist issues of material fact as to the severity of plaintiff's medical condition and, accordingly, summary judgment must be denied.

## POINT II

## THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S FOOT CONDITION.

In their moving papers, defendants argue that, because they provided care to plaintiff, they may (at most) be accused of malpractice or negligence, but not of deliberate indifference. As an initial matter, defendants appear to have overlooked the relevant case law in this regard. The few cases that address this issue (i.e., an abundance of ineffective care) state that the provision of inadequate care may well constitute deliberate indifference.

In *Thomas v. Arevalo*, No. 95 CIV. 4704, 1998 WL 427623, at *7 (S.D.N.Y. July 28, 1998), a case that coincidentally also arose at Downstate Correctional Facility, Judge Sotomayor wrote:

> [T]he State Defendants argue that these medical records show that they were not deliberately indifferent to plaintiff's medical needs because plaintiff received medical care, *e.g.,* plaintiff was frequently examined by the State Defendants and he was eventually referred to outside specialists. The Court of Appeals has found this argument insufficient when, as in the instant case, the "course of treatment was largely ineffective." The fact that plaintiff was frequently examined or referred to an outside specialist, alone, does not automatically preclude a finding of deliberate indifference. (citations omitted)

The Court of Appeals case to which Judge Sotomayor refers is equally on point and instructive:

> Nor does the fact that Foote frequently examined Hathaway necessarily vindicate Foote. The course of treatment Hathaway received clearly did not alleviate his suffering -- between May 1980 and October 25, 1982, he complained of hip pain on nearly fifty occasions. Twenty of these complaints were made in the period after the broken pins were discovered but before Hathaway was so informed. A jury could infer deliberate indifference from the fact that Foote knew the extent of Hathaway's pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve Hathaway's situation.

*Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994); *see also Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("Although federal courts are reluctant to second guess medical judgments and constitutionalize medical malpractice claims where the prisoner has actually received medical treatment, deliberate indifference will be found where the medical attention rendered was so woefully inadequate as to amount to no treatment at all. The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation."); *Williams v. Director of Health Svces.,* 542 F. Supp. 883, 885 (S.D.N.Y. 1982) (rejecting defendants' attempt to argue that they could not have been deliberately indifferent as a matter of law by "listing the number of examinations and tests that Williams has undergone, the number of doctors he has seen at the various prisons, and the amount of medication he has received.").

While not as precisely on all fours as *Thomas* and *Hathaway*, an earlier Second Circuit case is nonetheless relevant.  In *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974), the plaintiff alleged deliberate indifference in the defendants' failure to attempt to reattach his ear, which had been severed by another inmate.  The Court rejected the defendants' argument that "the doctor's decision merely to sew up the wound with ten stitches is based on nothing more than a difference of opinion over a matter of medical judgment," and wrote that "the possibility that deliberate indifference caused an easier and less efficacious treatment to be consciously chosen by the doctors cannot be completely foreclosed."[5]  The same could easily be said for the instant matter.

---

[5] Significantly, this holding was cited with approval by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 105 n.10 (1976).

In addition, defendants here again fail to acknowledge that the inquiry is highly fact-specific and that each of the cases that they cite was decided on the facts, not the law. *See, e.g., Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case."); *Denis v. N.Y.S. Dep't of Corr. Svces.*, No. 05 Civ. 4495, 2006 WL 217926, at *15 (S.D.N.Y. Jan. 30, 2006) ("Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances.").

To the extent that defendants may be arguing that they were not deliberately indifferent because only plaintiff's boots, but not his sneakers, caused him pain, the argument is misplaced for three reasons. First, under DOCS' own regulations, prisoners are required to wear boots, not sneakers. *See Kemp v. Wright*, No. 01 CV 562, 2005 WL 893571, at *1 n.3 (E.D.N.Y. Apr. 19, 2005). Presumably, this is because life at a correctional facility presents dangers or challenges that require protective footgear. It would be cynical to argue that plaintiff could have avoided one hazardous situation by exposing himself to another. Second, although the sneakers did not hurt plaintiff's feet in the same way that the boots did, the sneakers did not provide enough support for his feet and ankles, causing him severe pain and hastening the deterioration of his condition. (Abney Decl. ¶ 1.) Finally, although the sneakers were roomier than the boots, the defective arches still caused plaintiff severe pain, regardless of whether he used them in the sneakers or the boots. (*Id.* ¶ 2.)

**POINT III**

**SUPERINTENDENT      MCGINNIS      WAS
PERSONALLY INVOLVED.**

Former Superintendent McGinnis argues that he was not personally involved in the underlying constitutional violations despite having read and responded to three of plaintiff's grievances. The case law cited by defendant, however, is readily distinguishable and the relevant precedent supports plaintiff's position.

As Judge Kaplan pointed out in *Atkinson v. Selsky*, No. 03 Civ. 7759, 2004 WL 2319186, at *1 (S.D.N.Y. Oct. 15, 2004), the Second Circuit in "*Williams v. Smith,* 781 F.2d 319 (2d Cir. 1986), made it sufficiently clear that a prison official's denial of a grievance or grievance appeal is sufficient personal involvement to render that official liable under Section 1983.. . . [A] considerable preponderance of cases in this district hold that a prison official's denial of a grievance or grievance appeal is sufficient personal involvement to render that official liable under Section 1983." *See also Nunez v. Hasty*, No. 04 CV 1282, 2006 WL 2589254, at *7 (E.D.N.Y. Sept. 8, 2006) ("personal involvement may be found when a defendant participates in responding to an inmate's grievance."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Three of the cases cited by defendant (*Joyner*, *Cuoco*, and *McKenna*) are distinguishable because they make much of the fact that a superintendent should not be expected to second-guess medical determinations. In the instant matter, Superintendent McGinnis did not need to make any medical determinations whatsoever – he simply needed to see to it that plaintiff received medical equipment that was indicated but had not been provided. Defendant's

task -- which he failed to perform – was administrative, not medical.  In the fourth case, this Court stated no more than that "prison supervisors cannot be held personally liable when the sole allegation is that they received letters or grievances."  *Williams v. Koenigsmann*, No. 03 Civ. 5267, 2005 WL 1115426, at *5 (S.D.N.Y. May 10, 2005).  Plaintiff in the instant matter alleges far more than that Superintendent McGinnis simply received his grievances.

As is detailed in "Statement of Facts," *supra*, the IGRC twice found that plaintiff's medical needs had been ignored for an excessive period of time and that immediate action was required.  Superintendent McGinnis' only response to the August 2000 grievance and IGRC recommendation was to note that Mr. DiPompo had been contacted.  This response would have been entirely inadequate even if Superintendent McGinnis had bothered to verify that this was, in fact, the case.  Superintendent McGinnis, however, had not done even that much.

Superintendent McGinnis response to the November 2000 grievance and IGRC recommendation was even more problematic.  In response to plaintiff's complaint that he had effectively been without proper arch supports for four months and the IGRC recommendation for "speedy resolution," Superintendent McGinnis did nothing more than state the obvious -- that "the facility is currently awaiting reception of the special footwear."   Defendant McGinnis took no action whatsoever – he made no effort to look into why the matter was taking so long or whether a firm date had been provided, he never directed anyone to speed up the process, and he never followed up to see whether the equipment had ever come in.  If such a complete abdication of responsibility does not constitute "personal involvement," then it is hard to imagine what would.

# POINT IV

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants appear to argue in their moving papers that they are entitled to qualified immunity because it was not clearly established that plaintiff's foot condition was "constitutionally significant." Defendants rely primarily on the mandate of *Saucier v. Katz*, 533 U.S. 194, 201 (2001), that the qualified immunity inquiry be "undertaken in light of the specific context of the case."

There is no question that the law in regard to deliberate indifference to medical needs was clearly established during the time that plaintiff was incarcerated. *See, e.g., Johnson v. Wright*, 234 F. Supp. 2d 352, 367 (S.D.N.Y. 2002) ("At the time of the alleged violations in 1999-2000, the law regarding claims of inadequate medical treatment under the Eighth Amendment put defendants on notice that the Eighth Amendment is violated where a prisoner is deliberately not given medically necessary and available treatment.").

In asserting that they could not have been expected to know that failing properly to treat plaintiff's particular foot condition violated his constitutional rights, defendants read *Saucier* far too broadly. Indeed, just one year after it decided *Saucier*, the Supreme Court stated:

> Our opinion in *Lanier* [*United States v. Lanier*, 520 U.S. 259 (1997)] thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.

*Hope v. Pelzer*, 122 S. Ct. 2508, 2516 (2002); *see also Papineau v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) ("[W]e are mindful that the right at issue in a qualified immunity case need not be limited to the specific factual situation in which that right was articulated."); *Dipace v. Goord*,

308 F. Supp. 274, 281 (S.D.N.Y. 2004) ("[T]o defeat qualified immunity, it is not necessary to show a decision squarely on point indicating the violation of a constitutional right.").

In addition to the arguments raised by her co-defendants, Nurse Eckert also appears to argue that she is entitled to qualified immunity because she played only a "subordinate role." (DOCS Mem. at 21.) However, as Nurse Administrator, Nurse Eckert was in charge of scheduling plaintiff's appointments with Mr. DiPompo. She was also present at the beginning and end of each visit that plaintiff had with Mr. DiPompo. (Abney Decl. ¶ 10.) At the very least, an issue of fact exists as to the level of Nurse Eckert's involvement in defendants' complete failure to provide proper medical care to plaintiff.

In sum, defendants' claim that they are entitled to qualified immunity because they did not realize that plaintiff's suffering was of constitutional dimensions cannot, as a matter of law, justify a grant of summary judgment.

## CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that the Court deny summary judgment on all claims.

Dated:        New York, New York
              December 15, 2006

                              ROSE M. WEBER
                              Attorney for Plaintiff
                              225 Broadway, Suite 1608
                              New York, NY 10007
                              (212) 748-3355

                              By: _____/s_____
                                  ROSE M. WEBER (RW 0515)